Good morning, everyone. The first argued case this morning is LIQUIDNET HOLDINGS v. PULSE TRADING. Mr. McAuliffe. Thank you, Your Honor. Good morning. May it please the Court, my name is Joe McAuliffe. I represent LIQUIDNET, the patentee. There is no basis in this record to limit the claim term accessing to the reading of database records. LIQUIDNET is entitled to the full scope of that term, including a scope that covers the accessing techniques described in the specification. One such technique is the sending of commands to an API over a network. The proper interpretation of accessing must cover that technique, and any interpretation that doesn't is legal error. The invention here is not accessing a database. Mr. Marin and his co-inventors never claimed to invent databases or how to get information. Well, it seems to me, I mean, you started off by saying there's nothing in the record to support that view, but it seems to me the main thing in the record to arguably support that view is the language of the claim itself, which talks about accessing by at least one computer all records of open orders for a database. Isn't that not different than what you're telling us the claim means? No, it isn't, Your Honor. And in the specification, when it uses that term accessing, it specifically says one can indirectly access by sending commands to an API. Sending commands to an API would not be reading the records. So the question is, what does accessing mean? And the district court, which originally agreed that one of ordinary skill in the art would believe it to mean just gaining entry to, changed that interpretation to reading in memory. There was no basis for doing that. For example, there is no disclaimer here and the district court found none. This is not a situation where the district court read the file history or the specification and identified some statement where the patentee said, well, my invention doesn't go that far. That's not this case. There's no definition here. The district court didn't identify any definition in the patent documents. Again, I'm still struggling with the language I pointed you to in the claim language. What is accessing all records of open orders from a database? That doesn't mean anything? I mean, aren't you writing that to say accessing the database, but not all records of open orders from a database? No, Your Honor. And I know there's some reference in the specification, but some of the specification does talk about accessing the database, which is something different, arguably, than accessing all records. I would respectfully disagree. That passage in the specification begins by saying reading records. It says creating records, and then it says monitoring records. But where are you in the specification? It's twice in the specification, Your Honor. I believe the first time is column three. The paragraph begins at about line 41. But my point is that paragraph summarizes by saying accessing the database right after it says reading the records, creating the records, monitoring the records. That reference there can only refer to those other operations on the records. It's simply a shorthand for saying accessing the records of the database. And indeed, if you read the rest of the specification, that's entirely consistent. There is no disclosure here, Your Honor, of any operation of accessing a database that doesn't actually get into the records. That's not in the specification. Every time they talk about going to that database, it goes to the records. So this sentence, column three, lines 49 to 52, can only be read to mean accessing the records of the database. The district court erred by limiting this claim to a single implementation. What this sentence says is the direct accessing of the database. But there's another disclosure here. That database, and yes, the records of it, can be accessed by sending commands to an API. That's what the specification says. Without a disclaimer or an express definition, that claim language should be interpreted to cover those techniques that the inventors explicitly stated in their specification could be used with the invention. The basis that the district court relied on for adopting a more limited view confirms the error. The only basis articulated is the teaching or description of figure seven in the specification. Now, that figure describes certain functionality that may happen in certain embodiments. It says expressly in certain embodiments this can happen. It never uses the word accessing. It never even uses the word reading. It just talks about retrieving information from a database when a trader logs on to the electronic marketplace. That's no basis for limiting the claim word accessing to cover simply the direct accessing described in the specification and exclude the indirect accessing also described in the specification. I guess I'm a little unclear. Does the specification refer to direct accessing and indirect accessing? It does indeed, Your Honor. In that same sentence at column three, lines 49 to 52, it refers to both directly accesses. I'm sorry, what line do you refer to? Column three, line 49 is where the sentence begins. It says the OMS database interaction module directly accesses the OMS database. In another embodiment, it sends commands to an application programming interface in the OMS for accessing the database. Are you saying that the claims only cover direct accessing and not indirect accessing? I'm saying as the district court construed them erroneously, they only cover reading, which would be a form of direct access. In the district, that was error. They must be construed to cover both of these sets of functionality because the inventor said you could do it either way. That is what was meant by accessing. The district court's interpretation is inconsistent with that teaching in the specification. It excludes the embodiment where the inventor say you can do this just by sending commands to an API, an application programming interface. It's also inconsistent with the file history. The original claims in this case used reading the database language. They were all canceled, every one of them, and the claims that were added, including the one that eventually issued and is being litigated here, used the accessing language. The district court's interpretation revoked that amendment, essentially, and second-guessed prosecution counsel's action. That's an improper use of claim interpretation. Before your time runs out, could I just ask you about another limitation in Claim 1, which is generating all non-binding indications from the access records of the order? Yes, Your Honor. It's unclear to me, how could the non-binding indications for the access records be generating without first reading the access records? Well, I think it's modified, Your Honor, that what gets generated are non-binding indications from the access records of orders that are suitable for transmission. So what is getting generated is from a subset of all records that are accessed. So this step occurs after whatever comes back from the database, and it may be a subset, as even the example of Figure 7 expressly says. After records are retrieved from the database, this generation occurs, but by its very terms, it's only on those that are suitable for transmission to the electronic marketplace. Yeah, I don't know, but you have to read all the access records, right? No, you have to access the records. You have to gain entry to them first, and then you generate these non-binding indications on whatever is retrieved after that entry. Well, how can it be generated without reading it? I'm saying, Your Honor, what gets generated gets generated off of what is retrieved, and that can be some subset of what the system actually gains entry to. Is that explained anywhere in the specs? I think in Figure 7, the description in Figure 7 says that exactly, Your Honor. Column 11, the paragraph that begins at line 17 – I'm sorry, it says line 22, Your Honor, is the specific sentence where it says, in other embodiments of the invention through the filtering module – oh, I'm sorry, line 20. I'm at column 11. Line 22, it says, in other embodiments of the present invention, the OIM-320, through the filtering module, makes the determination of suitable orders based on certain criteria. So, in other words, the system can retrieve, in the disclosed system, could retrieve all orders, open orders, or it can retrieve just those that are suitable for transmission to a marketplace. It determines which is which. How? There is a filtering module. There is a piece of software, and it says right here, it could be done on, for example, security type is an example. And that doesn't constitute reading? The retrieval does not constitute reading. The record below is undisputed on that. But the filtering process? The filtering process does not constitute reading. How is the filtering done if it doesn't entail reading to the extent of determining what the content of the record is? I would say it doesn't constitute reading the records in the database. Maybe I should be more precise. I think you're right. A filtering process would have to read something and compare bids. But I thought you were referring to the reading the district court required in its claim interpretation, which was reading in memory. It required reading of the records in the database. I think that filtering is an unclaimed step. Your Honor, I don't think there's any question about that. I think even the district court noted that that filtering was an unclaimed step. Your Honor. Let's hear from the other side and save your rebuttal time. Thank you. Mr. Kilman. Good morning, Your Honor. May it please the Court, Robert Kilman for Pulse Trading. The Court is absolutely correct. If we take Liquanet's argument that sending a call to the API constitutes accessing all records of open order, you'll have effectively read all records of open order right out of the claim. The district court's construction, and I think, Your Honor, sit on some of these points, why it was absolutely correct. First of all, in the context of the claim. Do you agree with your friend that the district court changed the construction? No. No, the district court explicitly did not change her construction. And we have a little bit of a change here from Liquanet. They're actually now arguing that the construction should be making a call to the API. What they argued below was that construction should be gaining entry to. The district court in her claim construction orders clearly stated gaining entry to and reading records. So this reading records notion, the district court had from the beginning in her claim construction order. She, in fact, quoted that exact same sentence in the summary judgment opinion. If you're gaining entry to records, you have to read them. And the court is correct. You would not be able to do the other steps of the claim if you don't first read the records. You can't determine which records are suitable for transmission without reading them. And looking at that Figure 7 description in Column 11, what the patent calls for is perhaps sending all of the records of open orders to the ETM, or perhaps just some of them. You can't determine if you're going to do some or all without reading those records. Going to Step 2 of the claim, you have to generate the non-binding indications from the access records. How can you do that without reading the records? Step 4 of the claim calls for periodically determining if any of the records have changed. How can you do that if you haven't read the records? Also, if you look in the file history, and I apologize, the picture we put in our brief, I should have used the one from Joint Appendix page 333. In the file history, Liquinet submitted a diagram showing their Liquinet invention. It says right on that diagram, accessing all records. What was the page of the Joint Appendix that you just saw? Page 333. 333. Great. Let's see. You can see on the left it says accessing all records. The lead line from the accessing all records leads right into the database to all the records. The file history is consistent with the context of the claims as well as the specification. Liquinet's presentation also touched on Column 3 of the patent. Column 3 of the patent, as recognized, does talk about reading records. Down below it talks about direct and indirect accessing. That's of the database. That's a step that comes before accessing records. How do we know that? I mean, isn't there some ambiguity here on the lines of the step that was pointed out to us? Well, the only time in the specification that it talks about records, it talks about reading the records. In Column 3 and in Column 10, it talks about accessing. It's just accessing the database. That would not give you access to the records. Would you focus on precisely what it is that you believe supports the non-infringement? Sure, absolutely. I think that will help to tie this all together. I think the district court summary judgment was proper because there are no facts to support accessing all records of open orders. It really doesn't even matter what accessing means because there's no record evidence at all of anything happening to the orders on the database. The undisputed facts demonstrate that PULSE's functionality stops with making a call to the API. The API is the application programming interface that's housed within their client's OMS database. So that's not PULSE's functionality. That's not PULSE's software. What we also have is the testimony from PULSE's expert, Jim Kanoky. Mr. Kanoky, even though there's no evidence of any specific PULSE integration and how records are accessed on any specific integration, Mr. Kanoky has experienced in the field and talked at a level of abstraction about how these databases would work. In the PULSE system, PULSE only accesses or only is returned U.S. equity orders. That's all they can trade on the electronic marketplace. It's undisputed that on an OMS database, all records of open orders are going to include records beyond U.S. equity orders. So what Mr. Kanoky testified to and explained is that on these OMS databases, which are highly complex, all highly customizable for unique applications such as PULSE, the way they work is PULSE sends its call to the API, this application programming interface, which handles external communications for the OMS database. That API then sends a command to store procedures that are on the database. So now we finally access the database. And everything that's happening here from the API on is all the OMS database and not PULSE. That stored procedure would then issue a command to find records of at most U.S. equity orders. When it issues that command, it will traverse an index on the database. That index will prevent you from accessing any records that are not U.S. equity orders. That is to maintain efficiency of the database and so you're not locking up records that are irrelevant to the search. That is how these database operators write the source code and that's how they access records. That is why the district court's summary judgment opinion was correct. There is no evidence. And that is why LiquidNet now here today and below attempted to change the claim to be making a communication with the API to somehow be accessing all records of open orders. The court's construction was gaining entry too. That means there has to be some action upon each and every record of open orders. The record evidence shows that would never happen in a PULSE implementation. That is why the district court was correct. So the district court's claim construction was right and the lack of fact that evidence was able to reduce during discovery means they cannot prove their case. And what I just described is just PULSE. PULSE has two different types of implementations. The first is the stored procedures and that's where LiquidNet focuses its case. There is a second type of implementation. It's called the web server implementation and these are actually even further away from the OMS database than the stored procedures. The way these work is PULSE doesn't even make a call to an API. PULSE's customer sets up a web server which is a separate computer, has the records sent there. PULSE communicates with this web server. So now there is another intermediary between PULSE and the OMS. So now PULSE is even further away from accessing all records of open orders. So LiquidNet hasn't even articulated the theory of infringement for these web server implementations. The other arguments LiquidNet makes, we didn't hear that during LiquidNet's presentation, but in their brief they also say that if reading is part of the claim, then PULSE meets that claim because they search and index. There's no record site for that statement and the record evidence, the only record evidence of this is Mr. Kanoky who says the exact opposite. That searching and index would mean you would never access all records of open orders if you only want U.S. equity orders. They also say if there's an unindexed query, you would have to lock the tables and search every single record. Well again, there's no evidence of this ever happening and the record evidence is the exact opposite. Mr. Kanoky testified and again he's unrebutted testimony. He testified in his declaration that these databases, which are very sophisticated, would never be run without an index. You would never have a circumstance where you are doing a search with an unindexed query. So in the end, LiquidNet, the district court really nailed the issue. She said what LiquidNet failed to do is confront the issue that is the stored procedures that are owned and controlled by the OMS vendors and PULSE's customers and not PULSE that actually access the records. That's why we're getting this twist on the claim to try to shoehorn something into the only evidence they have because PULSE stops at making a call to an API. And an API, just to reemphasize the point, is not capable of accessing any records of open orders. They point continuously to PULSE's stored procedure guide, which is just a general overview of how PULSE works. And all this describes is the format that PULSE would like to get these records back in. There's no evidence that the API can access any records of open orders. So I would submit that this whole argument about whether the court changed the claim construction or whether the court's claim construction was correct or not is really a red herring. It doesn't matter how you construe access. As long as that verb has meaning and the object of that verb is all records of open orders, LiquidNet cannot win its case. So unless your honors have any other questions on the accessing issue, I'd like to move on to our alternative grounds for affirmation. Okay, I appreciate it. Sure, thank you. The one I'd like to spend the most time on is the claim term non-binding indications. There are a few points made by LiquidNet in the reply brief that I would like to address here today. The court construed the term non-binding indication to require a further affirmative action. This further action has to be negotiation. And the court explained that to be in negotiation, at a minimum, you have to be able to have the capability to assent the terms of the other side's trade. The undisputed facts show that Pulse's two modes of operation, called AutoX and Confirm, can't assent the terms of the other side's trade. That is because in AutoX, what happens is the trader sits at his or her computer. The order pops up and they want to send it into the Pulse's marketplace, the BlockCross marketplace. If it's an AutoX order, it pops up. You select the quantity, a maximum quantity you would like to trade, and you hit go. It then goes into the marketplace. And as the name implies, it executes automatically. You don't take any other action. It just gets executed. For Confirm mode, it's very similar. The trader sets the quantity, sends it out to the marketplace. But in this circumstance, if there's a match, if the marketplace finds a match, it'll send back a pop-up window to the trader. And the trader has the opportunity then to adjust their quantity and then either decline the trade or go ahead with the trade. But same thing, once you hit that button again, it goes back out. And if that match is still there, it's executed. You never know who's on the other side of the trade. You never know the other side's terms of the trade. So there's no way that in AutoX or Confirm mode, that Pulse allows for negotiations construed by the court. And the claim construction by the court was correct. Non-binding indications, the district court found, was an ambiguous term. So the court turned to the intrinsic record. The specification, every embodiment of the specification requires negotiation. Not only that, but the specification describes negotiation and the disclosure of the invention section that's let off by calling it the present invention. So that's the specification. But the court found the most powerful evidence to be in the prosecution. During prosecution, the examiner rejected Liquinet's claim under 112, saying it was indefinite. The examiner then said, it's my understanding that non-binding indications contemplate negotiation. In response, in their remarks, Liquinet clearly stated that your understanding is correct and the purpose of non-binding indications is negotiation. Liquinet, in its reply brief, says that the definition should be non-binding purchase or sales offers. They took that and they say that the definition is clearly defined in the file history. They take that definition from joint appendix page 627. That's exactly where the district court got her definition. But what Liquinet has done is cropped out the back half of the district court's definition. It doesn't take the whole thing that talks about negotiation. So if we're going to use that as a definition, then the whole definition should be in there. And the district court's claim construction was correct. And the only other argument Liquinet makes in response to the district court's claim construction is to cite some comments the district court made at a hearing. That was a pre-motion hearing before the court had any papers in front of her. And she even recognizes this is a way for her to think off the top of her head and get her head around the issues. What should be controlling is what the district court put in her claim construction order and in the summary judgment opinion, where the court clearly said in her summary judgment opinion that to be negotiated at a minimum, you have to be able to ascend to the terms of the other side's trade. That can't be done. And undisputed facts show that cannot be done in the block cross system. And just quickly, Your Honor, there was one other alternative grounds for affirmance, joint infringement. I think that collapses into what we're saying on the infringement side, that since PULSE doesn't do any of the accessing of any records, it can't be held liable. It's a joint infringement case because you can't access records without this third party. And PULSE doesn't do it, and there's no evidence of it ever happening, so they can't prove a joint infringement case. And also, no matter what the standard for direction and control is, if that standard changes through Akamai or McKesson, the undisputed facts show that PULSE has no ownership, no control. It can't do anything to change the store procedures or the software running on the OMS databases that are used to access records. So LiquidNet also cannot prove a joint infringement case. And finally, LiquidNet has proposed by at least one computer. They would like to have that term construed. We'll rest on our briefs on that one. I think the briefs explain why this notion of automatic or without manual intervention was removed during prosecution by LiquidNet. So I'm out of time. Thank you, Your Honor. Thank you. Thank you, Your Honor. This is the testimony of PULSE's expert at deposition. You can access the data without reading it. That's in the joint appendix at page 1580. Mr. Gilman can stand here and tell you that in order to access database records, one must read them. But he doesn't have anything in the record to support that. PULSE uses the same technique described in the patent for accessing, sending commands to an API. Its own marketing documents say it sends non-binding indications to an electronic marketplace. It even markets itself as a less expensive LiquidNet. The district court said it didn't infringe because it doesn't perform these low-level database operations of reading the records, even though the undisputed record says for accessing, they're not required. That was error. The proper interpretation here is the one that covers the direct accessing described in the specification and the indirect accessing, the very function that PULSE does, sending commands to an API. If the court agrees with that and interprets the term accessing to mean gaining entry to, the case has to go back. PULSE has not even argued, except today in its brief, that it's entitled to any judgment under our interpretation. Its opposition brief was reading, reading, reading. It never said it was entitled to judgment as a matter of law under gaining entry to. Because it can't. There's no dispute. It does send commands to an API and to a web interface. And that should be sufficient on summary judgment to get my client to a jury. Now, even if the court does not agree with us on the interpretation of accessing and believes that the term requires reading in memory as the district court's modified interpretation, the case still has to go back. There is evidence from which a jury can find that that occurs. Mr. Gilman just confirmed it. That when those commands are sent, either all the records have to be read in the database or an index, which is created by reading all the records in the database, is accessed. In either situation, all the records are read in the database. And we have put evidence in the record to support a finding that PULSE is legally responsible for that activity. Those stored procedures are created under an implementation agreement between PULSE and its customers that references a specific technical document, the stored procedure guide, where PULSE defines what information is going to come out of that database when those commands are sent. From that evidence, a jury could find that the customer is being controlled and directed, both in the design of these stored procedures, these software programs, and when those commands are sent. In that activity, it's PULSE that is reaching across the network and controlling and directing that computer system in order to obtain the right information. When you say that indexing requires reading of records, that would be something which would be historically the case, I suppose, at least arguably, but not necessarily in response to an individual request, correct? I mean, if you have an index that's set up and the index already contains an array of information about the records that are in the database, you don't have to redo the reading at that point when you make an inquiry, correct? That's exactly correct, Your Honor. However, the accessing step is the first step of the claim, and there is nothing in the claim to limit when it occurs. There is no temporal limitation, nor is there any reference to sending a command and then accessing. It's the first step of the claim. The fact that it happens, that the reading, if that's what the claim means, happens before that API command is sent is of no moment. There's no such limitation in the claim. So under either interpretation, Your Honor, the judgment has to be vacated and remanded for trial. We have presented more than enough evidence to raise a fact issue. I guess I want to touch on quickly one other issue that was brought up. We're very short of time. Just a couple of sentences, please. We are maintaining the same interpretation we asserted below, gaining entry to without reading. That's our interpretation. It still is. Thank you, Your Honor. Thank you both. The case is taken under submission. The court will stand in recess for 15 minutes. All rise. The article is taken short of recess.